

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| RYSON CARTER, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 1:04-22346-HFF |
| | § | |
| WESTINGHOUSE SAVANNAH RIVER | § | |
| COMPANY, LLC, and WSRC/BSRI | § | |
| DISABILITY INCOME PLAN, | § | |
| Defendants. | § | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I.    INTRODUCTION

This is an Employee Retirement Income Security Act (ERISA) case. The Court has

jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and other relevant statutes. The question

before the Court is whether Defendants abused their discretion in denying Plaintiff's claim for Total

and Permanent Disability (TPD) benefits. Having carefully considered the memoranda, the replies,

the record, and the applicable law, it is the opinion of this Court that the question must be answered

in the affirmative, and, thus, judgment will be entered for Plaintiff.

## II.    FINDINGS OF FACT

A.    Relevant Provisions of the Plan[*]

Plaintiff is a former employee of Westinghouse Savannah River Company (WSRC), where

he worked until he was terminated because he could not perform the essential functions of his job

---

[*]Adopted from Defendants' Memorandum in Support of Judgment.

due to medical restrictions.  As an employee of WSRC, Plaintiff was a participant in the WSRC/BSRI Disability Income Plan (Plan), and the WSRC/BSRI Pension Plan.

On or about February 17, 2004, Plaintiff applied for TPD benefits pursuant to the Plan, and Incapability Retirement (IR) benefits pursuant to the WSRC/BSRI Pension Plan.  (A.R. 35.)  To receive TPD benefits under the Plan, Plaintiff must prove he is "unable to perform any type of work due to an injury or illness." (A.R. 202);  (A.R. 170) (to receive TPD benefits the claimant "must not be able to perform any job"); (A.R. 177) (employee qualifies for TPD benefits if employee is unable to work at "any reasonable occupation").  To receive IR benefits, a Plan participant must prove only that he is unable to perform the essential functions of his own job.  (A.R. 172.)

A Plan participant applying for TPD benefits must submit medical evidence that he cannot perform any reasonable occupation.  Further, the "medical evidence should include a statement from [the employee's] attending physician as to the reason why [the employee is] disabled, and the length of time [the] disability is expected to last." (A.R. 178.)  Based on the medical evidence submitted by Plaintiff, Defendants accepted his claim for IR benefits, but denied his claim for TPD benefits. (A.R. 16-17.)

The Plan Administrator is vested with full power and sole discretion to interpret the terms of the Plan and make the final determination as to whether an employee is qualified to receive benefits under the Plan.  (A.R. 214.)

B.     Medical Evidence Initially Presented by Plaintiff

In making his initial claim, Plaintiff submitted evidence from three medical doctors.

1.    Dr. W.H. Kaesemeyer

According to a Dr. Kaesemeyer's March 2, 2004, notes, Plaintiff "takes seizure medications which interfere with concentration and memory. This requires monthly visits to ensure compliance with [blood pressure medications]." (A.R. 36.) Although Dr. Kaesemeyer indicated that he believed that Plaintiff was "capable of performing any reasonable occupation," he referred the reader to Plaintiff's neurologist for details concerning Plaintiff's seizure disorder. (A.R. 36.) Dr. Kaesemeyer asserted that Plaintiff's prognosis was "good." (A.R. 36.)

2.    Dr. Harold C. McGrade

According to Dr. McGrade's April 8, 2002, notes, Plaintiff suffers from "a seizure disorder secondary to the development of meningioma [brain tumor] overlying the right motor strip." (A.R. 39.) Subsequently, on January 7, 2004, Dr. McGrade saw Plaintiff for a nocturnal seizure disorder and dizziness. (A.R. 41.)

> I saw Mr. Carter in the office today in expedited follow up for a new complaint. He got out of bed this morning. He originally felt well and then felt a sensation of falling forward. There was no control over this. He apparently lost consciousness for a brief period of time. There was no description of vertigo before the event. His wife reports that he shook before falling to the ground. Other descriptions are not available. The patient reports that he was able to grab onto the wall before collapsing to the ground and heard his wife calling his name in the distance. His prior seizures are described as being partial motor seizure beginning in the left arm followed by generalized motor activity. He is on Depakote currently at a dosage of 500 mg twice a day. He does have a cardiologist that he sees. This was not known to me the last time I saw the patient. I have advised for urgent follow up. He will contact me later on to give me the name of his cardiologist so that I can send him a report and also begin the process of ordering cardiac testing. He will go up on his Depakote dose to 1000 mg at night with a 500 mg dose taken in the morning. A repeat Depakote level and LFTs will also be checked. He will keep his prior scheduled follow up, which should be in the next 6-8 weeks.

(A.R. 41.)

       3.     Dr. Khaled Kamel

The records show that Plaintiff underwent an MRI at Dr. Kamel's request on October 17, 2003. (A.R. 60.) The MRI showed the following:

> **IMPRESSION:**
> 1. Findings consistent with interval craniotomy with resection of what most likely represented a meningioma. Slight increased signal, both on T1 and T2 weighted images, is noted in the region of the tumor bed most consistent with blood products. No abnormal mass effect is noted on the adjacent midline structures.
> 2. Mild atrophy for the patient's stated age.
> 3. Findings consistent with paranasal sinus disease, which has improved in the interval from a comparison exam of 11/28/01.

(A.R. 60-61.)

Dr. Kamel's December 2003 report reflects that he asked Plaintiff what he was able to do. Plaintiff responded that he "could do a supervisory position as in inspection especially with his 17 years of experience. Also could potentially handle a desk job with paperwork." (A.R. 48.) Although Dr. Kamel noted that Plaintiff "should not operate heavy machinery or equipment," he also stated that Plaintiff "is able to ambulate and is currently driving [and] there has been no recent reported seizures and it is felt that seizures are under fair control." (A.R. 49.) Dr. Kamel agreed with Plaintiff's assessment of his own capabilities, and thought he "would be able to perform in a supervisory or a position as an inspector . . . or a sedentary job, for example a desk job with paperwork." (A.R. 49-50.) Dr. Kamel also observed that Plaintiff's seizures were "being maintained currently on Depakote. (A.R. 49.)

According to a March 2, 2004, form, when Dr. Kamel was asked whether Plaintiff "is capable of performing any reasonable occupation[,]" Dr. Kamel replied, "yes." (A.R. 44.) Then, in commenting on Plaintiff's prognosis, Dr. Kamel stated, "Claims problems. Doubt significant."

(A.R. 44.)  On the form, however, Dr. Kamel refers the reader to his March 5, 2004, office notes.

In those notes, Dr. Kamel sets forth the following:

> Patient reports headaches about 4 days out of the week.  The noise in his head is getting worse and he  reports that his company wants to retire him.
>
> **. . .**
>
> Speech is normal. . . . Mental status is intact . . . . Gait is normal. Able to walk on heels, toes and tandem.
>
> **ASSESSMENT:**
>
> Prior surgery for meningioma, condition felt to be stable.
>
> Dizziness improved with Scopolamine.
>
> "A noise in his head" of unclear cause.
>
> Seizure disorder, still having few spells.
>
> Tension headaches under poor control.
>
> Decreased concentration with some elements of depression, medication side effect or multifactorial.
>
> Mild evidence for peripheral neuropathy.
>
> Prior history of fatigue and sleepiness.  Not a significant current problem, will proceed with plan.
>
> At this point with patient's multiple complaints of long list of chronic problems it is agreed that it would be best for him to retire.

(A.R. 45-46.)

  C.  Defendants' Initial Consideration of Plaintiff's Claim

  Having received Plaintiff's claim, Defendants had one of their physicians, Dr. Gaines

Entrekin, examine Plaintiff's medical records.  After reviewing the records, Dr. Entrekin observed

on March 18, 2004, that

> 51 y/o with seizure disorder (focal motor) secondary to development of R parietal meningioma . . . . [H]e remained "seizure-free" on medication for an indeterminate period of time, depending upon which physician's record is examined.  At some point, he was diagnosed with "nocturnal seizure disorder," also of a focal motor nature.  These seizures have not been as well-controlled with medication.  As recently as Jan/04, he had an observed seizure, which resulted in loss of consciousness.
>
> Another concern is his reported inability to concentrate, initially attributed to Topomax, though no improvement has ben noted essentially 5 months after this Rx has been discontinued. . . .
>
> . . .
>
> This employee has been significantly depressed ever since returning to work from his surgery in 11/01. However, he doesn't accept this (depression) as a diagnosis, and though repeatedly urged to seek treatment, he is reluctant to do so. Although his tumor was histologically benign, it has functionally disabled him at this time. Some of his complaints may, as described by Dr. Kamel, represent side effects of his medications, but others may be functional in origin. It is extremely unlikely, without adequate treatment of his depression, that he will be able to be employable.

(A.R. 33.)

He further determined that Plaintiff was "unable to perform in his/her normal work assignment (e.g. Driving to/from work, sitting or standing for prolonged periods . . . ." (A.R. 34.) Moreover, according to Dr. Entrekin, Plaintiff was incapable of "physically or mentally . . . maintaining employment on a continual basis" and was not currently "trainable in a skill that could qualify him for other employment."  (A.R. 34.)

D.    Initial Denial

By letter dated March 25, 2004, Defendants denied Plaintiff's claim, maintaining that

> [t]he medical information provided does not provide medical evidence that meets the qualifications for a Long-Term Disability benefit, as described on page 7 of the "Disability" booklet of your Benefits Handbook . . . . as your medical condition does not exclude you from being gainfully employable in sedentary occupations.

(A.R. 16.)

E.      Additional Materials Considered on Appeal

Plaintiff subsequently appealed Defendants' decision.  As a part of the appeal, Plaintiff

submitted an affidavit from himself as well as one from Dr. McGrade.

1.      Plaintiff's Affidavit

Plaintiff's affidavit  provides, in relevant part, that

> 6. . . . I suffer from a number of problems including a severe seizure
> disorder. I also suffer from severe sinus problems, frequent
> headaches, and severe fatigue.
>
> 7. As a result of my seizures I suffer from a continuous noise in my
> head that is completely distracting, irritating, and at times unbearable.
> I suffer from short term memory problems and it is extremely difficult
> for me to focus or concentrate on any task for any extended period of
> time due to the continuous noise or sound in my head. I also suffer
> from paralysis in my extremities and weakness and pain in my left
> side. I have severe dizziness and balance problems and it is difficult
> for me to ambulate. I also suffer frequent, extremely severe
> headaches. As a result of my seizures I suffer from black outs,
> involuntary kicking of my legs, and I bite down on my lips and
> tongue. When I experience a headache I cannot perform any type of
> activity at all and I am required to wait until it passes before I can
> perform any activity again.  When I suffer a seizure, I am incapable
> of doing anything. I do not know when or where I will suffer a
> seizure. After I suffer a seizure I suffer from extreme and profound
> fatigue and I have to rest for an extended period of time.  It is
> necessary for me to nap frequently throughout the day in order to
> attain any sort of temporary relief from my problems.
>
> 8. . . . As a result of my prescription medications I suffer from
> dizziness and headaches.
>
> 9. . . . My inability to work has caused me grief and depression, and
> if I could go back to work and again become a productive working
> person I would gladly do so. I have not voluntarily chosen to suffer
> the problems which plague me and if I could obtain any relief from
> the same I would. Unfortunately, despite the best efforts of me and
> my physicians I have been unable to obtain any sort of permanent
> relief from the severe problems that plague me. . . .

(A.R. 76-79.)

2.      Dr. McGrade's Affidavit

Dr. McGrade's affidavit states, in relevant part, that

2. Again, Mr. Carter is a patient of mine and his medical records are attached hereto as exhibit A. I respectfully refer the reader to those records for the specifics of his medical problems and treatment history.  Mr. Carter suffers from a number of problems including seizure disorder.  He also suffers from severe sinus problems, frequent headaches, and severe fatigue.

3. Subjectively, as a result of his seizures Mr. Carter tells me that he suffers from a continuous noise in his head that he states is completely distracting and irritating, and nearly unbearable.  He states he suffers from short term memory problems and that it is extremely difficult for him to focus or concentrate on any task for any extended period of time due to the continuous noise or sound in his head.  He tells me he also suffers from weakness and pain in his left side. Mr. Carter has balance problems intermittent with headaches and he states that it is difficult for him to ambulate and he states he suffers from frequent, extremely severe headaches. He also tells me that as a result of his seizures he suffered from black outs, involuntary kicking of his legs, and that he bites down on his lips and tongue. When he experiences a headache he states that he is required to lie in a dark room with his eyes closed until it passes.

4. Mr. Carter is currently taking the following prescription medications Cardizem, Accon, Provacol, Prevex, Atican, Neurontin, Rhinocort, Relpax, and Allegra.
**Cardizem**
   dizziness or lightheadedness
   flushing (feeling of warmth)
   headache
   excessive tiredness
                                    • • •
**Neurontin**
   drowsiness
   headache
   fatigue
   blurred vision
   tremor
   anxiety
   irregular eye movements

8

• • •

**Relpax**

• • •

dizziness

• • •

**Allegra**
headache

• • •

5. It is my understanding from Mr. Carter that his disability insurer has terminated payment of benefits to him asserting that there is some job that he is capable of performing on a full-time and consistent basis.

6. It is further my understanding that the disability insurance policy in question contains a definition of disability as follows:

> You qualify for Total and Permanent Disability benefits if you are unable to work at any reasonable occupation due to an accident or illness.

7. It is my opinion, based upon my medical education and experience based upon my specific knowledge of Mr. Carter's problems and treatment history that he is and has been completely and totally disabled from performing any job on a full-time basis, consistent with the definition of disability above. I render my opinion based upon the cumulative effect of Mr. Carter's above described physical problems, the subjective symptoms he suffers, and the side effects of his prescription medication.

(A.R. 80-83.)

3.     Nurse Reviewer

It appears that Defendants forwarded Plaintiff's medical records, with the exception of Dr. Kamel's records, to a nurse reviewer for her opinion regarding Plaintiff's disability. According to the nurse,

> [t]he records currently available do not provide documentation of objective pathology causing Mr. Carter to be unable to work when his

9

short term disability ended on 8/19/04. It is noted that several other providers/specialists evaluated Mr. Carter, further diagnostic procedures were recommended and at least one surgical intervention was anticipated to assist with reducing symptoms. Due to the litigated nature of this case, it is recommended that further records are obtained and reviewed.

• • •

Based on the lack of objective findings, the records ending 7/21/04 do not appear to support a determination of total disability. Considering the references to other providers, diagnostic procedures, at least one surgical intervention and the current report of the case litigation, the following recommendations are noted.

1. Obtain the following medical records:
Records from Dr. Oliver, (primary care physician) in Aiken, SC from 1/1/01 to 12/31/04 to establish Mr. Carter's pre-surgical medical condition and post-surgical complaints. Records from Ildemaro Valcan, MD[,] neurosurgeon regarding evaluations, diagnostic studies, operative reports and progress notes from 1/1/01 to 12/31/04. Records from Harold McGrade, MD, neurologist from 6/21/04 to 12/31/04 including all progress notes and diagnostic study reports.
Reports from W.H. Kaesemeyer, MD, internal medicine from 7/21/04 to 12/31/04 including all progress notes, lab reports and other diagnostic study reports.
Records from Dr. Schelling and other ENT specialists regarding evaluations and any surgical procedures from 1/1/01 to 12/31/04 (Dr. McGrade indicated on 12/22/03 that an unnamed ENT had evaluated Mr. Carter. A second ENT evaluation was recommended). Records from Khaled Kamel, MD, neurologist from 1/1/01 to 12/31/04 including all progress notes and diagnostic testing results.
Records from Dr. Cundey, MD, cardiovascular specialist from 2/13/04 to 12/31/04 including any additional progress notes and/or diagnostic study reports.

2. If not already determined, obtain information regarding any other medical providers from whom Mr. Carter sought treatment between 1/1/01 and 12/31/04 and obtain those records.

3. After additional records are obtained, further record review is recommended.

4. After additional records are obtained, referral for neurological IME is recommended to evaluate Mr. Carter and provide a determination

regarding Mr. Carter's objective findings and ability to perform any
type of work.

5. If requested, assistance may be provided with IME coordination.

(A.R. 237.)    There is no indication in the record that Defendants followed any of these

recommendations to obtain additional materials.

F.    Final Denial Letter

By letter dated August 18, 2005, Defendants wrote the following to Plaintiff's counsel:

> In response to the additional information submitted to me on your
> client, Ryson Carter, Jr., I have reviewed thoroughly all the
> documents included in the package.  In addition to my review, I asked
> our outside medical review group to examine the documents and
> report their findings back to me.
>
> I was unable to find any additional conclusive documents to support
> Mr. Carter's claim for long-term disability under the WSRC/BSRI
> Disability Income Plan (Plan).  The outside medical review group
> stated that there is a large volume of subjective complaints found in
> the documents provided, but no objective findings that would support
> the Plan definition of long-term disability.
>
> In conclusion, I believe my original denial of the long-term disability
> benefit under the Plan is correct and is supported by  the medical
> documents that have been submitted to me.

(A.R. 1.)

III.    **CONCLUSIONS OF LAW**

A.    Standard of Review

In reviewing the denial of benefits by ERISA-governed plans, courts generally apply a de

novo review.   If, however, the documents governing the plan grant the plan or the claims

administrator discretion to interpret or apply the plan's terms, as in the instant case, the Court will

review the decision for an abuse of discretion.  *Haley v. Paul Revere Life Ins.*, 77 F.3d 84, 89 (4th

Cir. 1996) ("[I]f the plan administrator's decision falls within the scope of the administrator's contractually conferred discretion, the court may review the merits of an administrator's decision only for an abuse of discretion.").

When evaluating a plan administrator's decision for abuse of discretion, the Court may consider only evidence before the plan administrator at the time of the decision. *Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994). The administrator's decision must stand unless unreasonable, even if the Court would have reached a different conclusion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989); *Booth v. Wal-Mart Stores Inc. Assoc. Health and Welfare Plan*, 201 F.3d 335, 341 (4th Cir. 2000). "Under the abuse of discretion standard, the plan administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995) (internal quotation marks and citation omitted). Substantial evidence is the quantum and quality of relevant evidence that is more than a scintilla but less than a preponderance and that "a reasoning mind would accept as sufficient to support a particular conclusion." *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984), *overruled by implication on other grounds by Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003); *see also United Seniors Ass'n v. Social Sec. Admin.*, 423 F.3d 397, 404 (4th Cir. 2005).

The Fourth Circuit has identified numerous factors that may be considered in the "abuse of discretion" analysis. One such factor is whether the plan administrator has a conflict of interest. *Booth*, 201 F.3d at 342-43. In this regard, when a conflict of interest exists, arising out of the fact that the plan administrator is also the plan insurer, a court must "review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting

free of the interests that conflict with those of the beneficiaries." *Id.* (citing *Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 152 (4th Cir. 1996)). Thus, although the plan administrator's decision is still reviewed for an abuse of discretion in these circumstances, "this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir. 1997).

The parties disagree as to whether there is a conflict of interest in the case at bar. This Court is of the opinion, however, that the arguments are of no moment. As detailed below, the Court concludes that Defendants abused their discretion in denying Plaintiff his TPD benefits under either standard.

B.      Defendants' Denial of Plaintiff's Claim

As discussed herein, the Court concludes that Defendants decision to deny Plaintiff's claim was unreasonable.

1.      Dr. Kaesemeyer's Records

Defendants' reliance on Dr. Kaesemeyer's records is misplaced. Although it is true that Dr. Kaesemeyer stated that Plaintiff is capable of performing any reasonable occupation and, further, that his prognosis is good, it is clear that these assertions are in relation to the malady for which Dr. Kaesemeyer treats Plaintiff-- hypertension. The doctor refers the reader to Plaintiff's neurologist for details concerning Plaintiff's seizure disorder, the basis for Plaintiff's claim for TPD benefits.

2.      Dr. McGrade's Records

Defendants' argument that Dr. McGrade's affidavit is unsupported by the evidence in the record is in error. The Court's exhaustive review of Dr. McGrade's affidavit alongside Plaintiff's medical records convinces the Court that the statements in the affidavit comport with the medical records, which include both subjective complaints and objective medical testing.

13

### 3.     Dr. Kamel's Records

Defendants' reliance on Plaintiff's statement, and Dr. Kamel's subsequent agreement, that Plaintiff "would be able to perform in a supervisory or a position as an inspector . . . or a sedentary job, for example, a desk job with paperwork[,]" (A.R. 48) is also improper. As observed by Plaintiff, "[t]here is no dispute that Plaintiff believed that he could work in <u>December 2003.</u> However, the reason the foregoing is not really "<u>important</u>," or even relevant is that Plaintiff did <u>not</u> cease work . . . . [until] March 29, 2004[,] and only after his condition had worsened." (Pl.'s Rep. 3) (emphasis in original).

Defendants emphasize that Dr. Kamel indicated that Plaintiff "is capable of performing any reasonable occupation[.]" (A.R. 44.) Although this statement may provide some evidence to support Defendants' decision to deny Plaintiff's claim for TPD benefits, it provides a scintilla at best. Dr. Kamel's later statement in which he agrees that it would be best for Plaintiff to retire, (A.R. 46), lessens the import that the former statement might have.

### 4.     Dr. Entrekin's Records

Any suggestion by Defendants that Plaintiff could perform a sedentary job ignores the opinion of Dr. Entrekin, who stated that Plaintiff is "unable to perform in his/her normal work assignment (e.g. Driving to/from work, sitting or standing for prolonged periods . . . .") (A.R. 34.). Therefore, in that a sedentary job is, by definition, one that is characterized by or requiring much sitting, it appears that Defendants' own doctor disagrees with any argument that Plaintiff can perform a sedentary job.

14

Moreover, according to Dr. Entrekin, Plaintiff was incapable of "physically or mentally . . . maintaining employment on a continual basis" and was currently not "trainable in a skill that could qualify him for other employment." (A.R. 34.)

Defendants also make much of notes in the record that seem to indicate that Plaintiff's seizures were under control, but then for no apparent reason, ignore Dr. Entrekin's statement that Plaintiff's "seizures have not been as well-controlled with medication. As recently as Jan/04, he had an observed seizure, which resulted in loss of consciousness." (A.R. 33.)

    5.  The Nurse Reviewer

Defendants' failure to follow the nurse reviewer's recommendation to obtain further information before making its decision as to whether Plaintiff was able to perform any type of work evidences to this Court that Defendants' decision was unreasonable. Simply stated, this failure fortifies Plaintiff's argument that Defendants' denial of Plaintiff's claim was not "the result of a deliberate, principled reasoning process." *Bernstein*, 70 F.3d at 788.

Although it is well established that it is the burden of the claimant to establish his disability, *Gable v. Sweetheart Cup Co. Inc.*, 35 F.3d 851, 855-56 (4th Cir. 1994), it is also well established that the plan administrator has a responsibility to provide a full and fair review of a claim for benefits, 29 U.S.C. §1133 (stating that every employee benefit plan "shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim). From the Court's review of the record, it appears that Plaintiff met his burden, but Defendants did not.

    C.  The Booth Factors

The Court has considered the factors laid out in *Booth v. WalMart Stores*, 201 F.3d 335, 341 (4th Cir. 2000), and finds that Defendants' decision here was unreasonable. Notably, and as detailed

herein, Defendants failed to give a full and fair review of Plaintiff's claim in that they neglected to secure adequate materials in making their decision, wholly ignoring the nurse reviewer's recommendation to do otherwise. Consequently, the decision was not reasoned and principled.

    D.    The Deferential Standard

This Court is fully cognizant of the deferential substantial evidence standard of review applicable to the Court when it reviews an ERISA denial of benefits claim. Consistent with this deferential standard and considering the record as a whole, the Court must nevertheless ensure that the record contains some evidence beyond a mere scintilla that would allow reasonable minds to concur in the conclusion reached by Defendant. Mindful of this deferential standard, the record yields, at best, a mere scintilla of evidence to support Defendants' decision that Plaintiff's claim should be denied. Defendants' finding that Plaintiff was not entitled to TPD benefits was not reasonable inasmuch as it was not the result of a deliberate, principled reasoning process and it was not supported by substantial evidence. *Bernstein.*, 70 F.3d at 788. There is, however, substantial evidence in the record for this Court to conclude that Plaintiff is disabled according to the terms of the plan. Accordingly, the Court must reverse the decision of Defendants.

## IV.    CONCLUSION

Based on the foregoing, it is the opinion of this Court that Defendants abused their discretion in denying Plaintiff's claim for TPD benefits. Accordingly, the decision of Defendants is hereby **REVERSED**.

    **IT IS SO ORDERED**.

Signed this 29th day of August, 2007, in Spartanburg, South Carolina.

                            s/ Henry F. Floyd
                            HENRY F. FLOYD
                            UNITED STATES DISTRICT JUDGE